FREEDMAN + TAITELMAN, LLP
Jesse Kaplan, Esq. (SBN: 255059)
jkaplan@ftllp.com
September Rea, Esq. (SBN: 261121)
srea@ftllp.com
1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Tel.:  (310) 201-0005
Fax:  (310) 201-0045

Attorneys for Plaintiffs Kasem Cares, Inc., and Kerri Kasem

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KASEM CARES, INC., a California non-profit public benefit corporation; and KERRI KASEM, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>CAMERON GLENAR, an individual; ROSE STREET PRODUCTIONS, LLC, a California limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>(1) DECLARATORY RELIEF AS TO COPYRIGHT OWNERSHIP;<br><br>(2) BREACH OF ORAL OR IMPLIED AGREEMENT;<br><br>(3) BREACH OF FIDUCIARY DUTY;<br><br>(4) ALTERNATIVELY, BREACH OF ORAL OR IMPLIED IRREVOCABLE NON-EXCLUSIVE COPYRIGHT LICENSE;<br><br>(5) ALTERNATIVELY, QUANTUM MERUIT<br><br>[DEMAND FOR JURY TRIAL] |

1    Plaintiffs Kasem Cares, Inc., and Kerri Kasem (collectively, "Plaintiffs")

2    allege as follows:

3                                    **INTRODUCTION**

4         1.    Unfortunately, elder abuse is a growing epidemic in this country.

5    This includes the isolation, abuse and financial exploitation of the elderly.  Plaintiff

6    Kasem Cares, Inc. ("Kasem Cares"), is a charitable organization formed by

7    plaintiff Kerri Kasem ("Kasem") that seeks to eliminate elder abuse, increase

8    awareness, promote visitation rights legislation, and help those who are in need.

9         2.    In 2015, Kasem and Kasem Cares partnered with Cameron Glenar

10   ("Glenar") and his newly formed so-called production company Rose Street

11   Productions, LLC ("Rose Street") to jointly produce a low budget feature length

12   documentary film exposing the growing problem of elder abuse and isolation of

13   seniors across America (the "Documentary").  At least in part, the Documentary

14   would tell the story of Kasem's struggles to locate her ailing father Casey Kasem

15   and her advocacy efforts since then.  Once completed, the parties were to jointly

16   market the Documentary for sale and/or distribution so that the Documentary could

17   be exhibited to the public at large.

18        3.    Exposing the public to the subject matter of elder abuse was the

19   primary common goal of producing the Documentary.  The parties desired to raise

20   awareness concerning elder abuse, and in turn, increase charitable donations to

21   Kasem Cares.  In joint promotional materials, Glenar succinctly articulated the

22   joint venture's common goal – **"My hope is that this documentary can save**

23   **lives."** (emphasis added).  The parties knew that it was unlikely that the

24   Documentary would make any money.  If, however, there was any revenue from

25   the Documentary, at least half of such revenue would be used for charitable and

26   humanitarian purposes through Kasem Cares.

27        4.    Subsequently, Kasem Cares and Kasem fulfilled their end of the

28   bargain from both a creative, promotional and financial standpoint.  Kasem became

1   the Documentary's executive producer and was integral in developing and

2   shooting the Documentary.  Furthermore, fundraising for the Documentary was run

3   through Kasem Cares.  At one point, Kasem Cares even secured a sizable donation

4   that was needed to move forward with the more expensive postproduction phase.

5   Kasem Cares agreed that those funds would be explicitly used for that purpose.

6      5.     Despite the joint production of the Documentary, in approximately

7   June of 2016, Glenar's intentions suddenly and inexplicably changed: Glenar's

8   ostensible goal of using the Documentary for humanitarian purposes and to "save

9   lives" was replaced with greed - using the Documentary to extract a quick six

10  figure payday from a charitable organization that only wanted to use the

11  Documentary to help people and promote its cause.  That is, around that time,

12  Glenar and his so-called production company suddenly refused to move forward

13  with production of the Documentary with Kasem and Kasem Cares, and sought to

14  exclude them from the Documentary project.  In no uncertain terms, Glenar told

15  Kasem Cares that if it wanted the Documentary "bad enough," Kasem Cares would

16  have to pay Glenar $100,000.  Upon information and belief, Glenar and Rose

17  Street have shelved the Documentary, hoping that the mere passage of time will

18  force Kasem Cares to pay Glenar a ransom for the Documentary footage (the

19  "Footage").

20     6.     Through this lawsuit, Kasem Cares and Kasem seeks to recover the

21  Footage from Glenar and Rose Street so that Kasem Cares and Kasem can finally

22  complete the Documentary, and utilize the Documentary for its intended purpose –

23  fighting elder abuse.

24              **PARTIES, JURISDICTION, AND VENUE**

25     7.     Plaintiff Kasem Cares is a California a California non-profit public

26  benefit corporation duly organized and existing under the laws of the State of

27  California, with its principal place of business in Los Angeles County, California.

28     8.     Plaintiff Kasem is an individual residing in Los Angeles County,

1    California.

2        9.     Upon information and belief, defendant Rose Street is a California

3    limited liability company organized and existing under the laws of the State of

4    California, with its principal place of business in Los Angeles County, California.

5        10.    Upon information and belief, defendant Glenar is an individual

6    residing in Orange County, California.

7        11.    The true names and capacities of defendants named herein as Does 1

8    through 10, inclusive are unknown to Plaintiffs, and therefore, Plaintiffs sue these

9    defendants by such fictitious names.  Plaintiffs will seek leave of Court to amend

10   this Complaint to show their true names and capacities when such information has

11   been ascertained.  Upon information and belief, Does 1 through 10, inclusive, were

12   other members, managers, owners or operators of Rose Street and participated in,

13   and were otherwise responsible for the acts and transactions alleged herein and are

14   liable for the conduct alleged herein.

15       12.    Upon information and belief, each defendant was the agent, employee,

16   or co-conspirator of the other defendants, and was at all times mentioned herein,

17   acting within the scope of such agency, employment, or conspiracy.

18       13.    This action asserts claims that arise under the Copyright Act of 1976,

19   17 U.S.C. § 101 *et seq.* (the "Copyright Act").  Kasem and Kasem Cares seek a

20   judicial declaration of their ownership rights to a certain work under 17 U.S.C. §

21   201(a).  In the alternative, Kasem and Kasem Cares seek a determination that they

22   possess an irrevocable non-exclusive license to use the Documentary Footage in

23   question pursuant to 17 U.S.C. § 203(a).  This Court has original and exclusive

24   jurisdiction over this action under the Copyright Act.  This court has supplemental

25   jurisdiction over the closely related state law claims asserted herein pursuant to 28

26   U.S.C. § 1367(a).

27       14.    This Court has personal jurisdiction over defendants in that

28   defendants conducted business in this District, defendant(s) reside in this District,

1    defendants intentionally direct activities to this District, and the wrongful acts

2    alleged in this Complaint occurred in this District.

3         15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that a

4    substantial part of the events or omissions giving rise to the claims alleged herein

5    occurred in this District.

6                              **COMMON FACTS**

7         16.    Kasem is a multimedia personality, producer, and writer who has

8    anchored numerous music, talk and entertainment programs for both radio and

9    television.   Kasem is the daughter of the late radio host and icon Casey Kasem.

10   Kasem has followed in her father's footsteps, hosting many radio programs,

11   including many nationally and internationally syndicated radio programs.  Kasem

12   has also produced, hosted and appeared in various television shows.  Kasem is a

13   graduate of the Academy of Radio Broadcasting and the American Academy of

14   Dramatic Arts.

15        17.    Tragically, Casey Kasem's health began to decline in 2013.  Around

16   that time, he was diagnosed with Lewy body dementia, and he was no longer able

17   to speak during his final months.  As his health declined, Casey Kasem's then wife,

18   Jean Kasem, prevented Kerri Kasem and her siblings from seeing their father.

19   Both protests and legal battles by the Kasem family ensued.  After Casey Kasem

20   was removed from a nursing home by his wife, a court granted Kerri Kasem a

21   temporary conservatorship over her father and ordered an investigation into his

22   whereabouts.  Ultimately, Casey Kasem was found in the state of Washington

23   where he died at the age of 82.

24        18.    Kasem has since become an outspoken advocate for visitation rights

25   and elder abuse awareness.   She began promoting and advocating visitation rights

26   legislation that provides legal recourse when adult children are denied access to a

27   parent by their parent's current spouse, by another family member or any third-

28   party (the "Kasem Legislation").

19.     In 2015, Kasem helped found Kasem Cares to assist adult children and family members whose ability to visit and/or communicate with an ailing parent or family member has been terminated, unreasonably restricted, or otherwise obstructed by a third-party.  To that end, Kasem Cares supports and promotes the Kasem Legislation.  Another primary goal of Kasem Cares was to increase awareness concerning the sometimes unspoken problem of elder abuse and inhumane treatment of the elderly in America, and help those in need.

20.     To help achieve its various goals, Kasem Cares accepts charitable donations.

21.     Upon information and belief, Glenar worked as a crew member in the reality television industry since the late 1990s.  For the most part, upon information and belief, Glenar worked as a production assistant or video "logger" until approximately 2010.  Upon information and belief, from 2010 to the 2015, Glenar worked as an assistant story editor, associate story producer or story producer on several reality/unscripted television projects that aired on smaller cable stations.

22.     Upon information and belief, Glenar has no practical experience producing or financing a documentary film, let alone a feature length production.  Upon information and belief, Glenar has no practical experience behind the camera or directing any television or motion picture project.

23.     Following the passing of Casey Kasem, Kerri Kasem began receiving written correspondence from not only supporters of her cause, but those who shared similar experiences.  In 2014, Glenar reached out to Kasem to voice his support and share a similar experience concerning his elderly father.

24.     Kasem and Glenar stayed in touch.  At least initially, Glenar and his wife Natalie Glenar seemed very interested in Kasem's cause and the Kasem Legislation.  Eventually, Glenar and his wife became involved in and supporters of Kasem Cares.  At one point, Natalie Glenar became a Kasem Cares' employee.  Glenar explicitly stated that he was "happy to be a part of the team," and that his

1    involvement in Kasem Cares was "a calling."

2        25.    In 2015, Kasem was working with a bestselling author and producer
3    to potentially produce a television series about elderly parents who were isolated
4    from their families.  Around the same time, Glenar told Kasem that he had a
5    similar concept for a feature length documentary.  At the time, Glenar's idea was
6    nothing more than an unrefined and vague concept.  It lacked any story, content,
7    subjects to shoot, or funding.  Moreover, Glenar conceded that he did not have the
8    knowledge or experience to produce a documentary, especially a feature length
9    documentary.

10       26.    In the summer of 2015, Glenar approached Kasem and Kasem Cares
11   about a potential joint venture between Glenar, Kasem and Kasem Cares.  Glenar
12   indicated that he wanted to partner with Kasem and Kasem Cares.  During initial
13   discussions, Glenar, Kasem and Kasem Cares discussed the joint production of the
14   Documentary, the value that Kasem and Kasem Cares would add, and how the
15   Documentary could be used by Kasem Cares to educate the public about elder
16   abuse prevention and increase charitable donations to combat against elder abuse.

17       27.    Upon information and belief, in approximately August 2015, Glenar
18   formed Rose Street to act as his so-called production company.  Upon information
19   and belief, Glenar is a member and manager of Rose Street.  Upon information and
20   belief, Rose Street has no real assets and conducts little to no actual business.
21   Upon information and belief, Rose Street had never produced any content.

22       28.    Initially, Kasem Cares tentatively agreed that it would provide Glenar
23   with access to certain content within its possession and control (in particular
24   Kasem Cares' personnel, and the stories and letters from victims who had reached
25   out to Kasem and Kasem Cares) while Kasem Cares and Kasem determined if they
26   would partner with Glenar.  In August 2015, Kasem Cares and Rose Street entered
27   into a certain Video Rights Agreement while Kasem Cares contemplated entering
28   into a joint venture with Glenar and his production company.  By its express terms,

1   the Video Rights Agreement was intended to be an "interim agreement" since
2   Glenar and Rose Street desired to immediately begin some shooting while Kasem
3   Cares considered partnering with Glenar and Rose Street.  Indeed, the Video
4   Rights Agreement was designed to prevent Glenar and Rose Street from using
5   Documentary footage without Kasem Cares' express written consent.  Stated
6   differently, Kasem Cares wanted to maintain control over the contemplated
7   Documentary project.

8           29.    During subsequent discussions, Glenar, Rose Street, Kasem and
9   Kasem Cares continued to discuss the joint production of the Documentary, the
10  value that Kasem and Kasem Cares would add, and how the Documentary could be
11  used by Kasem Cares to educate the public about elder abuse prevention and
12  increase charitable donations to combat against elder abuse.  Among other things,
13  Glenar and Rose Street indicated that at least a significant portion of the
14  Documentary could focus on Kasem's story, her struggles to locate he father and
15  her advocacy efforts.  Glenar and Rose Street wanted to use the public's
16  recognition of the Kasem name to get the Documentary's message out.

17          30.    Consequently, in the fall of 2015, Rose Street, Kasem and Kasem
18  Cares entered into an oral or implied agreement whereby they agreed to jointly
19  produce the Documentary and utilize the footage, and once completed, jointly
20  market the Documentary for sale and/or distribution.  Indeed, Glenar, Rose Street,
21  Kasem and Kasem Cares further agreed on the common goal of using the
22  completed Documentary to raise awareness concerning elder abuse, and in turn,
23  increase charitable donations to Kasem Cares.  The Parties further discussed that
24  Kasem Cares would be able to freely use and exhibit the Documentary to
25  audiences of its choosing in order to educate, raise awareness and increase
26  charitable donations.

27          31.    The parties also understood that it was unlikely that the Documentary
28  would make any money.  The parties, however, explicitly discussed that in addition

1   to using the Documentary to raise awareness, that at least half of any revenue from
2   the Documentary would be donated to Kasem Cares and used to further advance
3   Kasem Cares' goals.  The parties further agreed that at least part of the
4   Documentary would be about Kasem and her father, and that Kasem would share
5   her story for use in the Documentary.

6        32.   Production of the Documentary began in late 2015.  The parties'
7   agreement was manifested through their conduct which continued through
8   approximately mid- 2016.

9        33.   Kasem and Kasem Cares immediately became integral to the
10  production of the Documentary from both a creative and financial standpoint, and
11  furnished significant consideration in connection with the Documentary project.
12  Among other things, Kasem and Kasem Cares promoted the project, sponsored the
13  project, allowed the Documentary to be affiliated with Kasem Cares, and engaged
14  in fundraising efforts directed at its supporters and others.  Kasem Cares provided
15  the use of  Kasem Cares' name and good will, and Kasem's name, image and
16  likeness to help promote the project and fundraising for the project within the elder
17  abuse prevention community and beyond.  Notably, it was agreed that fundraising
18  for the Documentary project would be conducted through Kasem Cares and that
19  Kasem Cares would be the Documentary's "fiscal sponsor."  Glenar and Rose
20  Street advised the public to donate to the Documentary through Kasem Cares and
21  thanked the public for donating to Kasem Cares.

22        34.   Kasem Cares also helped produce promotional and advertising
23  materials, including without limitation, a trailer for the Documentary featuring
24  Kasem and others that was designed to generate financing from Kasem Cares'
25  supporters and beyond.

26        35.   At one point, Kasem Cares secured and pledged the financing that was
27  desperately needed to complete the Documentary's production, namely the more
28  expensive postproduction phase.

36.     Kasem Cares further provided a large majority of the content and material needed for the Documentary, including access to Documentary participants and interviewees, their stories and related material.  Kasem Cares provided access to Kasem Cares' database of victims that were utilized as subjects for the Documentary.  In order to secure the appearance of these victims in the Documentary, they were all told that their stories and any footage of them would be used in a Kasem Cares' documentary about isolation and elder abuse.  That was the only reason these victims agreed to participate in the Documentary - they believed the Documentary was a response to the letters they wrote to Kasem Cares and Kasem.  Simply put, Kasem Cares was absolutely necessary to identifying and securing content, participants and interviewees.

37.     Kasem Cares secured Kasem's publicity rights in connection with the Documentary and the promotion of the Documentary, rights to her story and Kasem's services as the Documentary's executive producer and as talent.

38.     Kasem and Kasem Cares also drove production of the Documentary from a creative standpoint and advanced the project to the post-production stage. Kasem served as the Documentary's executive producer since the project's inception.  Kasem continuously maintained creative control and decision making authority over the Documentary.  Both Glenar and Rose Street consistently objectively manifested Kasem's role and authority over the Documentary.

39.     Kasem has made valuable and copyrightable creative contributions to the Documentary.  By way of example only, Kasem was instrumental in developing the Documentary's story and the Documentary's content, scripting content, and determining and choosing interview subjects, the content of interviews, staging of scenes and interviews, camera placement, lighting, and locations and events to include in the Documentary.  In fact, Glenar and Rose Street did not even participate in certain shoots for the Documentary.

40.     Despite the joint production of the Documentary, in approximately

COMPLAINT

1  June 2016, Glenar and Rose Street refused to move forward with production of the
2  Documentary, and in a gross breach of their contractual and fiduciary obligations
3  that they owed to Kasem Cares and Kasem, they sought to exclude Kasem Cares
4  and Kasem from the Documentary project.  Again, they told Kasem Cares that if it
5  wanted the Documentary "bad enough," Kasem Cares would have to purchase the
6  Footage from Glenar.  Most recently, Glenar demanded $100,000 for the raw
7  Documentary Footage.

8  ## COUNT I

9  ## DECLARATORY RELIEF AS TO COPYRIGHT OWNERSHIP

10  **(17 U.S.C. § 2201 and 17 U.S.C. § 201(a))**

11  **(Against All Defendants)**

12      41.     Kasem Cares and Kasem reallege and incorporate herein by reference
13  paragraphs 1 through 40 as though fully set forth herein.

14      42.     Kasem, as the Documentary's executive producer, was the "author" of
15  the Documentary and the Footage, and in turn, is the owner of the Copyright in the
16  Documentary and the Footage under 17 U.S.C. § 201(a).

17      43.     Kasem made independent copyrightable contributions and exercised
18  creative and artistic control and decision making authority over the Documentary
19  and the Footage.  Kasem gave effect to the general idea or concept of a
20  documentary film about elderly parents isolated from their adult children, created
21  the specific content and stories for the Documentary, and had control how that
22  content and those stories would be developed and expressed to the audience.

23      44.     Glenar and Rose Street objectively manifested their intent that Kasem
24  would be the Documentary's author and executive producer.

25      45.     Moreover, the audience appeal of the Documentary and the Footage
26  derives from Kasem and her contributions to the project.

27      46.     An actual controversy has arisen and now exists between Kasem and
28  Kasem Cares, on the one hand, and Glenar and/or Rose Street on the other hand,

COMPLAINT

concerning their respective Copyright ownership rights to the Footage. Glenar and Rose Street dispute that Kasem was the "author" of the Footage and the Documentary, and in turn, that Kasem and/or Kasem Cares is the Copyright owner of the Documentary and the Footage, or at least one of the Copyright owners.

47. Kasem and Kasem Cares seek a judicial determination of their rights pursuant to 28 U.S.C. § 2201, and a declaration that Kasem and/or Kasem Cares is the author of the Documentary and the Footage, and that Kasem and/or Kasem Cares is the owner and holder of the Copyright in the Documentary and the Footage. A judicial declaration is necessary and appropriate at this time under the circumstances so that Kasem and Kasem Cares may ascertain their Copyright rights to the Documentary and the Footage.

48. Accordingly, 8445 seeks a declaration that Kasem and/or Kasem Cares is the owner of the Copyright in and to the Documentary of the Footage, or at least one of the Copyright owners.

## COUNT II
## BREACH OF ORAL OR IMPLIED JOINT VENTURE AGREEMENT
### (Against All Defendants)

49. Kasem Cares and Kasem reallege and incorporate herein by reference paragraphs 1 through 48 as though fully set forth herein.

50. As alleged, Kasem, Kasem Cares, Glenar and Rose Street entered into an oral agreement whereby they agreed to jointly produce the Documentary and utilize the Footage, and once completed, market the Documentary for sale and/or distribution so that the Documentary could be exhibited to the public at large.

51. Alternatively, assuming that there was not an oral agreement between the parties, Kasem, Kasem Cares, Glenar and Rose Street entered into an implied agreement whereby their conduct demonstrated and confirmed that they agreed to jointly produce the Documentary and utilize the Footage, and once completed, jointly market the Documentary for sale and/or distribution so that the

1   Documentary could be exhibited to the public at large.

2      52.    The parties conduct was intentional, and Glenar and Rose Street

3   knew, or had reason to know, that Kasem Cares and Kasem would interpret such

4   conduct as an agreement to enter into a contract.   In particular, Kasem Cares and

5   Kasem objectively manifested their intent to create a Documentary.  To that end,

6   Glenar and Rose Street requested that Kasem Cares and Kasem provide content to

7   be used in connection with the Documentary, and encouraged and permitted them

8   to do so.  Glenar and Rose Street requested that Kasem produce the Documentary

9   and provide her services, her name, image and likeness in connection with the

10   Documentary, and encouraged and permitted her to do so.  Glenar and Rose Street

11   requested that Kasem Cares and Kasem promote the Documentary, and encouraged

12   and permitted them to do so.

13      53.    Glenar and Rose Street requested that Kasem Cares manage

14   fundraising efforts for the Documentary, and encouraged and permitted Kasem

15   Cares to do so.  Likewise, Glenar and Rose Street requested that Kasem Cares

16   obtain significant financing from one of its donors to complete the Documentary,

17   and encouraged and permitted Kasem Cares to do so.  Glenar and Rose Street

18   actively held Kasem out as the Documentary's executive producer.

19      54.    Glenar and Rose Street knew or should have known that Kasem and

20   Kasem Cares would have interpreted such conduct and Glenar's and Rose Street's

21   acceptance of such consideration from Kasem and Kasem Cares as an agreement

22   whereby Kasem and Kasem Cares would be joint producers and control the

23   production, distribution and/or sale of the Documentary.

24      55.    Kasem and Kasem Cares performed all obligations, conditions, and

25   duties imposed upon it by the agreement except insofar as such performance has

26   been waived, excused or prevented by reason of the acts and omissions of Glenar

27   or Rose Street.

28      56.    Kasem Cares and Kasem are also now ready, willing, and able to

perform all future conditions required by them to be performed in accordance with the terms and conditions of the agreement and continue to offer to perform them. , Kasem Cares and Kasem are ready, willing, and able to continue production of the Documentary and the financing of postproduction.   The consideration under the agreement is adequate and the agreement is just, fair and reasonable.

57.   Glenar and Rose Street have materially breached the agreement by: (1) refusing to continue production, sale and/or distribution of the Documentary with Kasem Cares and Kasem; (2) excluding Kasem Cares and Kasem from the Documentary project; (3) threatening to replace Kasem Cares and Kasem with what Glenar has described as "other partners"; and (3) refusing to provide Kasem Cares and Kasem with at least copies of the Footage and/or allowing Kasem Cares and Kasem to use the Footage to complete the Documentary.

58.   As a direct and proximate result of Glenar's and Rose Street's conduct, Kasem and Kasem Cares have suffered and continue to suffer damages in an amount to be proven at trial.  Kasem and Kasem Cares have been deprived of the Footage and the ability to continue the production, distribution and/or sale, and exhibition of the Documentary.  Glenar and Rose Street were substantial factors in causing this harm.

59.   Kasem Cares and Kasem do not have an adequate remedy of law in that monetary damages cannot adequately compensate Kasem Cares and Kasem for the loss of the Footage.  Absent an injunction and/or specific performance, Defendants' conduct will irreparably harm Kasem Cares and Kasem in that they will be without the Footage and its contents which are highly unique and cannot be replaced.  The Footage depicts and captures various historical events that have already occurred.  By definition, these past events and the Footage of those past events cannot be re-created and shot.  The Footage is also highly unique by virtue of its artistic and expressive nature.  Accordingly, even if new footage or a new documentary could be made, it would not be the same.

### COUNT III

### BREACH OF FIDUCIARY DUTY

#### (Against All Defendants)

60.     Kasem Cares and Kasem reallege and incorporate herein by reference paragraphs 1 through 59 as though fully set forth herein.

61.     Glenar and Rose Street owed Kasem Cares and Kasem a fiduciary duty by virtue of the joint venture that was formed between the parties to produce the Documentary, and once completed, jointly market the Documentary for sale and/or distribution.  A joint venture exists between Glenar, Rose Street, Kasem Cares and Kasem by virtue of the agreement that they have a joint interest in the Documentary project.  Glenar and Rose Street have admitted that Kasem Cares and Kasem were their "partners."

62.     As fiduciaries, Glenar and Rose Street owed Kasem Cares and Kasem a duty of loyalty and were required to act for the benefit and best interest of Kasem Cares and Kasem, at least in connection with the Documentary project.  Moreover, Kasem Cares and Kasem placed trust and confidence in Glenar and Rose Street in connection with the Documentary Project.  Among other things, they entrusted Glenar and Rose Street to hold the Footage for the benefit of Kasem Cares, Kasem and for the joint objective of completing the Documentary in order to educate the public,  increase charitable donations, and help people in need.

63.     Glenar and Rose Street knowingly acted against Kasem Cares' and Kasem's interests in connection with the Documentary by: (1) refusing to continue production, sale and/or distribution of the Documentary with Kasem Cares and Kasem; (2) excluding Kasem Cares and Kasem from the Documentary project; (3) threatening to replace Kasem Cares and Kasem with what Glenar has described as "other partners"; and (3) refusing to provide Kasem Cares and Kasem with at least copies of the Footage and/or allowing Kasem Cares to use the Footage to complete the Documentary.

64.     As a direct and proximate result of Glenar's and Rose Street's conduct, Kasem and Kasem Cares have suffered and continue to suffer damages in an amount to be proven at trial.  Kasem and Kasem Cares have been deprived of the Footage and the ability to continue the production, distribution and/or sale, and exhibition of the Documentary.  Glenar and Rose Street were substantial factors in causing this harm.

65.     Kasem Cares and Kasem do not have an adequate remedy of law in that monetary damages cannot adequately compensate Kasem Cares and Kasem for the loss of the Footage.  Absent an injunction and/or specific performance, Defendants' conduct will irreparably harm Kasem Cares and Kasem in that they will be without the Footage and its contents which are highly unique and cannot be replaced.  The Footage depicts and captures various historical events that have already occurred.  By definition, these past events and the Footage of those past events cannot be re-created and shot.  The Footage is also highly unique by virtue of its artistic and expressive nature.  Accordingly, even if new footage or a new documentary could be made, it would not be the same.

66.     The acts of Glenar and Rose Street as alleged herein were willful, wanton, malicious, and oppressive, and were taken with the intent to injure Kasem Cares and Kasem.  Around the same time that Glenar and Rose Street breached their fiduciary duties, Natalie Glenar, Glenar's wife, became outwardly hostile towards Kasem Cares.  Upon information and belief, Natalie Glenar was angry with Kasem Cares and desired to harm the organization, including Kasem Cares' fund raising activities.  To that end, Natalie Glenar convinced her husband and Rose Street to punish Kasem Cares, by among other things, engaging in the conduct identified above.  Moreover, upon information and belief, Glenar has recently run into financial difficulties.  Coupled with his wife's anger towards Kasem Cares, Glenar and Rose Street decided to engage in the conduct identified above in order to force Kasem Cares or one of its donors to use the charitable

donations as ransom money to pay Glenar and Rose Street for the Footage. Notably, Glenar and Rose Street demanded that Kasem Cares pay Glenar $100,000 for the Footage. As a result, Kasem Cares and Kasem are entitled to an award of punitive and exemplary damages in an amount sufficient to punish Glenar and Rose Street and to deter similar conduct.

**COUNT IV**

**ALTERNATIVELY, BREACH OF AN EXPRESS ORAL OR IMPLIED**

**IRREVOCABLE NON-EXCLUSIVE COPYRIGHT LICENSE**

**(17 U.S.C. § 2201 and 17 U.S.C. § 203(a))**

**(Against All Defendants)**

67. Kasem Cares and Kasem reallege and incorporate herein by reference paragraphs 1 through 66 as though fully set forth herein.

68. Alternatively, if Kasem or Kasem Cares is not the owner of the Copyright in the Documentary and the Footage, Glenar and Rose Street provided Kasem Cares and Kasem with either an express oral or implied non-exclusive license to use the Footage that was irrevocable under 17 U.S.C. § 203(a).

69. Glenar and Rose Street consistently told Kasem and Kasem Cares that they would be able to use the Footage and the Documentary to publicize their cause, educate the public, and increase charitable donations. In particular, Kasem and Kasem Cares were told they would be able to hire a professional editor to complete postproduction of the Documentary using the Footage. Moreover, Kasem and Kasem Cares were told they would be able to freely use and exhibit the Documentary to audiences of their choosing in order to educate, raise awareness and increase charitable donations.

70. Additionally, through their conduct, the parties demonstrated and confirmed their intent that Kasem Cares and Kasem could use the Footage to produce the Documentary and once completed, they would be able to use the finished Documentary to publicize their cause and increase charitable donations.

COMPLAINT

The parties conduct was intentional, and Glenar and Rose Street knew, or had reason to know, that Kasem Cares would interpret such conduct as an agreement to enter into a contract.   Kasem Cares and Kasem objectively manifested their intent to create a Documentary.  To that end, Glenar and Rose Street requested that Kasem Cares and Kasem provide content to be used in connection with the Documentary, and encouraged and permitted them to do so.  Glenar and Rose Street requested that Kasem produce the Documentary and provide her services, her name, image and likeness in connection with the Documentary, and encouraged and permitted her to do so.  Glenar and Rose Street requested that Kasem Cares and Kasem promote the Documentary, and encouraged and permitted them to do so.  Glenar and Rose Street requested that Kasem Cares manage fundraising efforts for the Documentary, and encouraged and permitted Kasem Cares to do so.  Likewise, Glenar and Rose Street requested that Kasem Cares obtain significant financing from one of its donors to complete the Documentary, and encouraged and permitted Kasem Cares to do so.  Glenar and Rose Street actively held Kasem out as the Documentary's executive producer.

71.    Assuming Glenar and/or Rose Street own the Copyright in the Footage/Documentary, Glenar and Rose Street knew or should have known that Kasem and Kasem Cares would have interpreted such conduct and their acceptance of such consideration from Kasem and Kasem Cares as an agreement whereby Kasem and Kasem Cares was permitted to use the Footage.  In particular, Kasem Cares and Kasem would be permitted to hire an editor for postproduction.

72.    The license agreement was supported by consideration and is therefore irrevocable under 17 U.S.C. § 203(a).

73.    Kasem and Kasem Cares performed all obligations, conditions, and duties imposed upon it by the oral or implied license agreement except insofar as such performance has been waived, excused or prevented by reason of the acts and omissions of Glenar or Rose Street.

74. Kasem Cares and Kasem are also now ready, willing, and able to perform all future conditions required by them to be performed in accordance with the terms and conditions of the license agreement and continue to offer to perform them. In particular, Kasem Cares and Kasem are ready, willing, and able to continue producing the Documentary. The consideration under the license agreement is adequate and the agreement is just, fair and reasonable.

75. Glenar and Rose Street have materially breached the license agreement by refusing to provide Kasem Cares and Kasem with at least copies of the Footage and/or allowing Kasem and Kasem Cares to use the Footage to complete the Documentary and/or for exhibition purposes.

76. As a direct and proximate result of Glenar's and Rose Street's conduct, Kasem and Kasem Cares have suffered and continue to suffer damages in an amount to be proven at trial. Kasem and Kasem Cares have been deprived of the Footage and the ability to finish the production of the Documentary and exhibit same. Glenar and Rose Street were substantial factors in causing this harm.

77. Kasem Cares and Kasem do not have an adequate remedy of law in that monetary damages cannot adequately compensate Kasem Cares and Kasem for the loss of the Footage. Absent an injunction and/or specific performance, Defendants' conduct will irreparably harm Kasem Cares and Kasem in that they will be without the Footage and its contents which are highly unique and cannot be replaced. The Footage depicts and captures various historical events that have already occurred. By definition, these past events and the Footage of those past events cannot be re-created and shot. The Footage is also highly unique by virtue of its artistic and expressive nature. Accordingly, even if new footage or a new documentary could be made, it would not be the same.

///

///

///

## COUNT V

## ALTERNATIVELY, QUANTUM MERUIT

### (Kasem Against All Defendants)

78.    Kasem Cares and Kasem reallege and incorporate herein by reference paragraphs 1 through 77 as though fully set forth herein.

79.    Alternatively, if Kasem or Kasem Cares is not the owner of the Copyright in the Documentary and the Footage, and there was no oral or implied agreement to enter into a joint venture to jointly produce market, sale and/or distribute the Documentary, Glenar and Rose Street must compensate Kasem for the services she provided in connection with the production of the Documentary.

80.    Throughout the course of the production of the Documentary, and at Glenar's and Rose Street's request, Kasem provided executive producer, talent, and promotional services in connection with the production of the Documentary. This includes, without limitation, the use of Kasem's name, image, likeness and her stories in connection with the Documentary.

81.    Glenar and Rose Street knew that Kasem was providing these services to the production of the Documentary and for Glenar's and Rose Street's benefit.

82.    Glenar and Rose Street accepted, used, and enjoyed the benefits of the services provided by Kasem.

83.    Though Glenar and Rose Street accepted, used, and enjoyed the benefits of the services provided by Kasem, Glenar and Rose Street have failed to and have refused to compensate Kasem for the value of the services she provided in connection with the Production.

84.    Kasem is entitled to the fair and reasonable value of the services she provided and Glenar and Rose Street accepted, used, and enjoyed.  Kasem has been damaged based on Glenar's and Rose Street's failure to compensate Kasem for the fair and reasonable value of her services.

/ / /

1    WHEREFORE, Kasem Cares and Kasem pray for judgment in their favor
2 and against defendants Glenar and Rose Street, and each of them, as follows:
3        1.    For a declaration that Kasem and/or Kasem Cares is the author of the
4 Documentary and the Footage, and that Kasem and/or Kasem Cares is the owner
5 and holder of the Copyright in the Documentary and the Footage under 17 U.S.C. §
6 201(a), or at least is one of the Copyright owners;
7        2.    Compensatory damages as determined at trial;
8        3.    Punitive damages as determined at trial based on Glenar's and Rose
9 Street's breach of fiduciary their duties;
10       4.    Prejudgment interest;
11       5.    A constructive trust for Kasem Cares' and Kasem's benefit on the
12 Footage being improperly held by Glenar and Rose Street;
13       6.    A temporary, preliminary, and permanent injunction restraining,
14 enjoining, and prohibiting Glenar, Rose Street, and  their agents, servants,
15 employees, officers, successors and assigns, and all persons and firms acting in
16 concert or participation with them or on their behalf from directly or indirectly (a)
17 excluding Kasem Cares and Kasem from the Documentary project, and (b)
18 preventing Kasem Cares and Kasem from accessing the Footage and/or using the
19 Footage to complete the Documentary, market, sell, distribute and/or exhibit same;
20       7.    A temporary, preliminary, and permanent injunction ordering Glenar
21 and Rose Street to provide Kasem Cares and Kasem with the Footage or a copy of
22 the Footage;
23       8.    That Glenar and Rose Street be ordered and compelled to specifically
24 perform under the oral or implied agreement or the oral or implied non-exclusive
25 irrevocable license, and  deliver the Footage to Plaintiffs so that Plaintiffs can
26 complete production of the Documentary using the Footage, and/or exhibit the
27 Footage and/or Documentary to audiences of Plaintiffs' choosing;
28       9.    Alternatively, the reasonable value of the services that Kasem

COMPLAINT

1    provided to Glenar and Rose Street;

2         10.    For the costs of suit incurred herein; and

3         11.    Such other and further relief as the Court deems reasonable,

4    necessary, proper and just.

5

6    DATED:  November 9, 2016              FREEDMAN + TAITELMAN, LLP

7

8                                          By: _____
                                                Jesse A. Kaplan
9                                               September Rea
                                                Attorneys for Plaintiffs
10                                              Kasem Cares, Inc., and Kerri Kasem

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

3      Plaintiffs demand a trial by jury.

4

5   DATED:  November 9, 2016          FREEDMAN + TAITELMAN, LLP

6

7                                    By:
8                                        Jesse A. Kaplan
                                         September Rea
9                                        Attorneys for Plaintiffs
                                         Kasem Cares, Inc., and Kerri Kasem
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28